Will you counsel a record for Mr. Singh before the IJ or the BIA? I was not personally, but my office did represent him. Would you just give them a message for me, please? This is the fifth case in a two-month period that I've heard where the facts are almost identical. Almost identical. Something isn't right. I don't know what's going on, but I want to caution the attorneys that I'm going to have them look into this. Something's wrong. I'm not saying in this case. I don't know about the others. But you can't have five people with virtually identical facts, same situation, again, different results with the IJ, but something's wrong. Life doesn't just happen like that. It's not a cookie cutter. So, I mean, one thing I'd say, Your Honor, is that, you know, I'm familiar of the discussion you had with Mr. Job last month when there were four cases that were consolidated by this Court because they had to do with a relocation issue that was common between them. I would assume that Your Honor is familiar, and Judge Wynn as well, that this Court deals with many, many appeals and has for years of people who are Sikh-Palestinian separatists from northern India. And the fact that there's many people applying for asylum from a very populous part of the world, I don't think in itself raises suspicion. With respect, counsel, I'm not talking about that. I'm saying that the alleged beatings, where they occurred, who inflicted them, what was paid to the police and bribed and so on, it's identical. I don't think that's actually true as to the five cases. It wasn't even true of the four cases, as your colleague pointed out at the argument last month. But here, I mean, the way that the agency deals with that is by assessing the credibility of individual applicants in individual cases. We take each case individually, and you will see with some of the results, you know, I'm very much in the client's favor. But I'm saying something is wrong. This is mathematically impossible to have five cases where the facts are almost exactly the same. Go ahead. Okay. I think if you were to look at situations in places where there's been mass persecution in the past, people's stories of how they were singled out, how they were persecuted by Soviet regimes in Rwanda, in Nazi Germany, a lot of the sort of ways that persecution happened to people would sound strikingly and disturbingly familiar because it's sort of a systematic process that's happening. One of the things that actually I noticed, and I don't see as many cases, but I've seen a few cases before, is this business of the amount of the bribe. Is there some social reason why the amount of the bribe seems to be all the same? I don't know. I don't think that's true from my experience, having also seen a number of these cases. You'd have to ask a Punjabi police officer, Your Honor. But I think moving to the specifics of this case, the agency found that it gave four bases for its adverse credibility determination. One was an omission from a credible fear screening interview that was conducted, and I think in a way that's kind of the biggest issue, and so I want to get back to that in a second. But first, if I can, I want to try to run through more quickly what I think were sort of objectively lesser and even more poorly founded bases. So first, as to the birth certificate, I think it's sort of manifestly trivial as to whether he had the copy of his birth certificate that was submitted to the court when he was in India or not. He explained that the birth certificate had been registered and that he was confused as to whether this particular document had been made then or not. Counsel, with respect, don't we look at the totality of the evidence here? You have a birth certificate which was issued after he left India. You've got different cards for elections where a later one is dated before the first one. There are just a whole bunch of things of that nature that go to credibility. Of course, the fact that he didn't mention an overnight stay at a police department where he was allegedly beaten is altogether something to take into account. Well, Your Honor, there's four things, like I said, that I'm happy to address in turn, and that's the way this court addresses them when it decides cases like this. Obviously, ultimately, it's totality, but that's sort of all we can do is look at them one at a time, and that's what this court does. With regard to the police beating, the failure to mention it under the credible fear interview, are you saying that he didn't have an opportunity to present kind of a narrative about, this is why I'm seeking asylum, this is what happened to me? There was no such opportunity during the credible fear interview? I don't think we argue that at all in our briefs. But then that goes to why it wasn't mentioned. That's the significant event, right? Right. It's a significant event to his claim as he sets it out in his testimony and his declaration. So what was his explanation for that, that he wasn't specifically asked, that he was only responding to questions that he was specifically asked? Right. And the instructions he was given before the screening interview started, this is at AR-1653, is to tell the truth and respond to all my questions. At his hearing before the IJ, he testified that he did exactly that, that he answered whatever they asked him, but he wasn't specifically asked if he was arrested because of his party, and so he didn't think that came up and he didn't mention it. However, when he was asked if he feared that the government would harm him, he said, yes, the government will severely harm me. When he was asked if he was arrested because of a nonpolitical crime, he said no, which is the case. His testimony was that he was never charged with a crime and the only reason he was arrested was because of his political activities. And so I think the IJ's reasoning on this point about the arrest and his explanation is they specifically focused on nonpolitical crimes. He wasn't asked about the arrest. He was asked if he was arrested because of a nonpolitical crime. That's the only question about an arrest, and he said no, and he didn't elaborate. I think the IJ's reasoning on this point comes from two defects. One is a misrepresentation of the record in saying that he was directly questioned about this incident. She said that the IJ said that at AR-92, and that's just not true. He wasn't directly questioned about this incident in which he was arrested because of his political activities or any other politically motivated arrest. I'm sorry? Kennedy. In the record that would substantiate that, that he was not so questioned? Yes, the notes of the credible fear interview at 1658 to 1661. Can you explain to me exactly what those notes are? Is it a verbatim transcript, or it's some other form of notation? No, it's not a verbatim transcript, and it specifically says at the top of the – it's sort of a credible fear worksheet, they call it, that it's not a verbatim transcript. It's an officer's – the asylum officer who's assigned to be doing these screening interviews down at the border while people are detained after they're apprehended. It's that officer's nonverbatim notes to help him decide the credible fear determination. It almost looks to me like it's a court reporter because it's good sentences and everything. But I agree, there was no question directly about other arrests, other political arrests. Right. So that's not in those notes. And certainly he could have brought it up. And it's not Judge Wynn that he didn't have a chance to bring it up. He was asked, is there anything else you'd like to add? He could have brought it up then. But I think it's just speculation on the part of the IJ putting herself in his shoes to say that in that situation I would expect someone to raise this. I mean, I think that kind of – No, no, I think that's a legitimate point, though. I know that the question wasn't phrased to directly call for that, but you're in a credible fear interview. You're trying to talk about your persecution and why you're seeking protection, and the subject of an arrest came up. And I didn't mean to suggest that he was – that they didn't limit it to nonpolitical crime, but you would think that that is something that you would volunteer. So I don't think it's ridiculous of the IJ to say, well, why wouldn't you bring this up? Right. And I think he explained that he didn't bring it up because it wasn't asked, and that was what he understood from the directions he got was to respond to the questions that were asked. And I think that's – I think that's a reasonable explanation. I think the IJ – I think under this Court's decision, for example, in Bondari, 227 F. 3rd, 1160 at 1167 from 2000, found that it was similarly improper speculation for an IJ to put herself in the place of a petitioner and make conjecture about what should or should not have been in the asylum application. That sort of rule about speculation not being substantial evidence still holds even under the Real ID Act, as in this Court's decisions in Wren and Gee. I want to move back to the issue of the election cards briefly. Now, granted, this was a bit confusing, sort of what happened here, but I don't think there's any support for the agency's – for the agency's statement that his – that he gave various explanations for this that were conflicting or how the BIA said his testimony was conflicting and evolving. He said that what the IJ labeled as Card 1 was a temporary card that he was first issued in December 2008. He then got a permanent card that was submitted, and that's what the IJ referred to as Card 2. However, he didn't have an original of that temporary card, and so – and this is sort of – was an odd thing to do, I think, but his understanding was that he had to have an original for all the ID docs that he submitted in immigration court, and so he had his father go to the sort of village bureaucrat and have a new original of that temporary card made, and then that was presented in court, and then the IJ had a copy of that made that's Card 3. The IJ herself clearly understood all this at AR-429. She said Card 1 is a photocopy that's lost. Card 2 is a permanent one with the correct birthdate. Card 3 is the most recent one, the replacement of the temporary card. It was only when she got to her decision that she erroneously said, this is the only ID information that was provided was these cards and that I have no idea who he is, when in fact he provided a bunch of other identity documents, all of which the originals were shown to DHS counsel. Counsel, if I understand it correctly, the election card number 3 has a different photo than election card number 1. Your client's testimony was that card number 3 was a reissue of card number 1. Right. So how did that work? Because I think it's that they had a new card made. His father went and took new photographs to sort of have the card remade or reissued, but it's not as if the sort of village agency – The reissue is not the same. Is that what you're saying? Well, they had a new card made of the temporary card from 2008, but they didn't actually have a record of the temporary card, and so they had someone kind of remake that temporary card. I mean, it's not something that I would do. It's a weird thing that he had done, but I don't think it detracts from the credibility as to any of the merits of his claim. Can I ask my colleague any other questions? No. All right, counsel, thank you. Thanks very much. Here we go. May it please the Court, Victoria Braga appearing on behalf of the Acting Attorney General. The Court should deny the petition for review because substantial evidence supports the agency's denial of relief and protection on adverse credibility grounds. Considering the reasons cited for the agency in finding that Mr. Singh had not testified credibly, most importantly, Mr. Singh failed to mention that he was beaten by police in June 2010 when he had a credible fear interview. This Court has held that omissions of beatings are significant. We agree, though, that there was a little mistake in saying that there was a direct inconsistency. There was an omission. Yes. If there was an omission because it's not a total transcript, right? Yes. So that's a mistake. What do we do with that? Well, I believe it was the immigration judge that said that there had been a direct question. I don't believe the board referred to it as a direct question. In that instance, it would be harmless error by the immigration judge. I think that the board's decision and the rest of the immigration judge's decision explains, as Your Honor was indicating earlier, that he had an opportunity to raise this issue during his credible fear interview. But what if that factored into the IJ's analysis and the IJ would have looked at that fact differently had he realized that it wasn't a direct question but it was an omission? We're supposed to assess the totality of the circumstances, so the IJ mistakenly thought that he'd been asked this and directly failed to respond when he hadn't. What do we do with that? Well, again, I think you can look at the board's decision affirming the adverse credibility finding, and I don't think the board is specifically affirming the fact that the petitioner was asked directly, were you arrested for a political crime and responded no. I think that you can look at the board's reliance on that fact as indicating that the credibility problem here is the fact that it's clear from what happened during the credible fear interview that Mr. Singh did have a chance to mention what had happened in June 2010. Notably, Mr. Singh now and before the agency explained that he doesn't believe during the credible fear interview he was asked about whether he had been mistreated or been arrested by police, but when he testifies to that fact before the IJ, he directly links it to his membership in the party, and that testimony is found in the record at pages 183 to 186. So to the extent that in the credible fear interview the interviewer is clearly asking Mr. Singh, and he doesn't dispute this, what harm occurred to him as a result of his party membership, he's not indicating, as he does before the IJ, that police mistreatment occurred to him as a result of his party membership. With regard to the identity documents, the IJ at the end made a finding that he wasn't sure, couldn't be sure who the petitioner was because of all these conflicting documents. What do we do with the fact that the IJ had earlier stated, I don't think his identity is an issue, and government counsel didn't think the identity is an issue, but yet in the end that's one of the grounds for an adverse credibility finding? Well, again, I don't think that relief was denied here based on the IJ not believing that the petitioner was who he said he was. I think the credibility problem relates to identity. I don't think there's anything preventing an IJ from indicating, while testimony is being given, that she maybe doesn't think that something is an issue, but then later when evaluating all of the testimony in its totality, finding that there is an issue with that. But ultimately, I don't think that she's making a finding here based on identity. I think she's saying that these documents, specifically the election cards, are so confusing and the explanation for them so evolving, and even after the explanation, the problems remaining, the fact that it's unclear why the temporary card was lost, it's unclear why there are different birth dates, it's unclear why there are different photographs. I think the IJ, and then the board later, is ultimately relying on those factors to say that that is something that makes them doubt the petitioner's credibility, and the election card, as it is evidence of the petitioner's identity, is evidence related to identity. But I don't think that there is an identity finding here that led to a denial of relief. I think it's simply an adverse credibility factor. Additionally, with regard to the birth certificate, that's another identity document where there's another inconsistency. The birth certificate indicates that it was issued after the petitioner had already departed for the United States. When the petitioner was showed the document during his proceedings, he indicated that he had had it in India. He later claims that he didn't believe that the DHS counsel was referring to the exact document that he showed him, but that's just implausible, and the immigration judge is not required to accept explanations for inconsistencies and omissions, even if they are plausible. In addition to the problems already cited with petitioner's testimony, including the fact that he failed to mention a police beating prior to his testimony, the issue with the election cards, that testimony just being very confusing and still leaving some holes, and the issue with the inconsistent testimony about whether he had the birth certificate, there's also his testimony that the Congress Party had won in his district for the 2012 elections, which is inaccurate, that I.J. and the board were correct to rely on this as... I'm actually not sure that's true. I thought the testimony was very confused about exactly which election and which entity in the election was being discussed, and there was also a confusion between which party he belonged to. There's a couple of different man parties, right? There was. I thought at some point everybody seemed confused about what they were talking about. Again, and I think that I will respond directly to your question, but I think the fact that everyone seems confused about what's being talked about at various points during this case really bears on the credibility of the petitioner. It's the petitioner's burden to prove that he is eligible for relief and to offer credible testimony in that regard. So to the extent there exists confusion regarding what he has been saying and what he has been submitting, I think that should and did in this case bear negatively on credibility. Well, if it's not his attorney and not him that's causing the confusion but rather the I.J. and the other attorney, then what can you do with that? That's true. It seems to me that the I.J. was confused at one point and then unconfused at another point, and perhaps same for the attorney. Yes. Again, I think there was a lot of confusion in this case. I think that's clear from the record. But regarding specifically the election, I think the confusion resulted from the fact that the I.J. believed that it was actually his party who had won the election, but it turned out it wasn't actually his party. It was just a different party, but it still was not the Congress party. And I think the board relies more generally on the fact that he was just unaware of the correct election results to bear negatively on his credibility, particularly considering that this is a claim based on political opinion and also based on the fact that he claims to have gotten the information from his father, who had been politically active even before him. It's just implausible that his father wouldn't know, not necessarily exactly who had won the election, but that would tell him that the Congress party had won the election. Doesn't this have a particular role here because he claimed to have been beaten by members of the Congress party, particularly targeted by members of the Congress party, and that was a factor? So if his role in the Mann Party was so important that members of the Congress party were beating him on the road and the police were beating him and the like, it seems reasonable that the IJ would be interested in knowing why he didn't know who had won an election since that seemed to be an important enough aspect of his life that he was being beaten for it. Yes, I think that is what the agency was indicating, that based on who he is and his political involvement, he and his father, who he claims was also politically active, should have had more of a general awareness to not indicate incorrect election results. Additionally, the agency denied Catt here, and that denial is supported by substantial evidence because the Catt claim is based on the same incredible testimony that the asylum and withholding claims are based upon, and the petitioner did not point to any other independent evidence in the record that would show that he would more likely than not be tortured. If there are no further questions, we ask the court to deny the petition for review. Thank you. Thank you, counsel. Thanks to both counsel. The case just argued is submitted.
judges: M. Smith, Nguyen, Restani